## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARRY GINSBERG, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>      v.<br><br>SMILEDIRECTCLUB, INC., DAVID KATZMAN, KYLE WAILES, STEVEN KATZMAN, ALEXANDER FENKELL, J.P. MORGAN SECURITIES, INC., CITIGROUP GLOBAL MARKETS INC., BOFA SECURITIES, INC., JEFFERIES LLC, UBS SECURITIES LLC, CREDIT SUISSE SECURITIES (USA) LLC, and CAMELOT VENTURE GROUP,<br><br>                Defendants. | Case No.:<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Barry Ginsberg ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation which includes, without limitation, the following: (i) review and analysis of regulatory submitted by SmileDirectClub, Inc. ("SmileDirectClub," "SDC," or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and media reports issued by and disseminated by SmileDirectClub; and (iii) review of other publicly available information concerning SmileDirectClub.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of persons and entities that purchased or otherwise acquired SmileDirectClub Class A common stock (a) pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's September 12, 2019 initial public offering ("IPO" or the "Offering"), or (b) during the period from September 8, 2019 through October 2, 2019, inclusive (the "Class Period"), and suffered damages in connection with the wrongdoing described in detail below. Plaintiff pursues claims against the Company, certain of its top officials, and certain banks which acted as underwriters to the IPO under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and under Sections 10(b), 20(a), and 20A of the Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2. SmileDirectClub was founded in 2014 and is headquartered in Nashville, Tennessee. The Company manufactures, markets, and sells clear dental aligner treatments through

its website https://smiledirectclub.com/ and over 300 brick-and-mortar retail locations (so-called "SmileShops").

3.      On September 12, 2019, SmileDirectClub completed its IPO, issuing shares at a price of $23.00 per share (the "Offering Price").  The Offering Price was inflated, and the shares have not traded remotely close to that price since becoming publicly available.

4.      The Company sold approximately 58.54 million shares of Class A common stock and received proceeds of approximately $1.27 billion, net of underwriting discounts and commissions.  The proceeds from the IPO were purportedly to be used for employee incentive bonuses, certain equity arrangements, and general corporate disclosures.

5.      On September 24, 2019, a class action lawsuit was filed in the Middle District of Tennessee by dentists, orthodontists, and consumers against the Company and certain of its officers and directors for false advertising, fraud, negligence, and unfair and deceptive trade practices.  The complaint alleges, *inter alia*, that inaccurate statements were made in the Registration Statement and that the Company is subject to litigation for operating as a dentist without proper licensing in several states, among other litigation.

6.      On this news, the SDC share price fell $1.47 (or nearly 9%), from $17.15 to $15.68 per share on September 24, 2019, on unusually high trading volume.  The price continued to decline over the next two trading sessions to close at $14.51 on September 25, 2019, and $12.94 on September 26, 2019, on unusually high trading volume.  The cumulative decline as a result of this disclosure was $4.21.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), 78t-1), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b), (c), and (d).  Substantial acts in furtherance of the alleged violations of the securities laws or their effects have occurred in this District.  Many of the acts charged in this Complaint, including the dissemination of materially false or misleading information occurred in, or emanated from, this District.  In addition, SmileDirectClub's shares are actively traded within this District.  Furthermore, all of the Underwriter Defendants (defined below), which each sold millions of SDC shares in the IPO, each maintain their corporate headquarters within this District

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

**A.    Plaintiff**

12.    Plaintiff, as set forth in the attached Certification, acquired SDC common stock at an artificially inflated price in traceable to the IPO and suffered damages as a result of Defendants' violations of the federal securities laws.

**B.    Corporate Defendant**

13.    Defendant SmileDirectClub is incorporated under the laws of the state of Delaware, and its principal place of business is located at 414 Union Street, 8th Floor, Nashville, Tennessee 37219.  The Company's shares trade in an efficient market on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "SDC."

**C.    Individual Defendants**

14.    Defendant David Katzman, co-founder of the Company, was, at all relevant times, the Chief Executive Officer and Chairman of the Board of Directors of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

15.    Defendant Kyle Wailes ("Wailes") was, at all relevant times, the Chief Financial Officer of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

16.    Defendant Steven Katzman was, at all relevant times, the Chief Operating Officer and a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

17.    Defendant Alexander Fenkell ("Fenkell"), co-founder of the Company, was a director of the company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

4

18.     Defendants David Katzman, Kyle Wailes, Steven Katzman, and Alexander Fenkell are collectively referred to hereinafter as the "Individual Defendants."

**D.     Underwriter Defendants**

19.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO.

20.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the Company's IPO.

21.     Defendant BofA Securities, Inc. ("BofA") served as an underwriter for the Company's IPO.

22.     Defendant Jefferies LLC ("Jefferies") served as an underwriter for the Company's IPO.

23.     Defendant UBS Securities LLC ("UBS) served as an underwriter for the Company's IPO.

24.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the Company's IPO.

25.     Defendants J.P. Morgan, Citigroup, UBS, Jefferies, BofA, and Credit Suisse are collectively referred to hereinafter as the "Underwriter Defendants."

**E.     Controlling Defendant**

26.     Defendant Camelot Venture Group ("Camelot") is a partnership with its principal place of business in Michigan.  Camelot is controlled by its managing partner, David Katzman, and is, as described on its website, the largest shareholder of SmileDirectClub and the managing member of the limited liability corporation that controls SmileDirectClub.  As such, Camelot – through its stock ownership, through its control as the managing member of SmileDirectClub, and

through its ability to appoint David Katzman and Steven Katzman as the operating officers of SmileDirectClub – controls SmileDirectClub and is directly liable for its actions and violations of the federal securities laws.

27.    According to disclosures made in the Registration Statement, Camelot was paid $3.3 million in management fees and expenses just in 2018, and regularly receives at least $150,000 per month in fees from the Company.

**SUBSTANTIVE ALLEGATIONS**

**<u>Background</u>**

28.    SmileDirectClub is a teledentistry company that purports to be the "first direct-to-consumer medtech platform for transforming smiles."  The Company produces 3D-printed clear dental aligners on 3D printers at its Tennessee headquarters, which are utilized by consumers to correct orthodontic issues.  The Company is expanding its SmileShop locations across the U.S. and internationally, however, the substantial majority of the Company's business and dentistry is conducted online through its website https://smiledirectclub.com/.

29.    In order to enroll in SmileDirectClub's services, consumers complete either a one-time payment of $1895.00 or monthly payments of $85.00 per month (amounting to $2290.00 in total).  The customer then has an impression made of their teeth, either in a SmileShop or by using the Company's remote impression kit.  The Company claims that all impressions are reviewed by a duly licensed dentist or orthodontist, who then oversee the treatment process.  From that 3D image, SDC manufactures the custom aligners and then sends them to the consumer with instructions for used, based on the plan selected.  SmileDirectClub purports to offer this service at a price far cheaper than traditional orthodontics and similar teeth-aligning products like braces.

6

## The Company's False and/or Misleading
## Registration Statement

30.     On or about May 3, 2019, SmileDirectClub filed with the SEC a Registration Statement on Form S-1, which, after several amendments, would be used for the IPO.

31.     On September 9, 2019, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1/A, which forms part of the Registration Statement.  The SEC declared the Registration Statement effective on September 11, 2019, and, on that same day, SDC and Underwriter Defendants priced and commenced the IPO.

32.     On September 13, 2019, SDC and the Underwriter Defendants filed the final prospectus for the IPO on Form 424B4 with the SEC, which forms part of the Registration Statement.  By and through the IPO, the SmileDirectClub sold approximately 58.54 million shares of Class A common stock at a price of $23.00 per share.  The Company received proceeds of approximately $1.27 billion from the Offering, net of underwriting discounts and commissions. The proceeds from the IPO were purportedly to be used for employee incentive bonuses, certain equity arrangements, and general corporate purposes.

33.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

34.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

35.     The Registration Statement made claims regarding the Company's market opportunity, which stated in relevant part that "[t]he global orthodontics market is large and

underserved . . . with less than one percent treated annually. We believe that our aligner treatment can help over 90% of people with malocclusion." The Company further claimed through its registration statement that its total market "is greater than 120 million people in the U.S. and approximately 500 million people globally."

36.     Furthermore, the Registration Statement details the "Member Journey" in which the Company makes the explicit claim that a "licensed doctor" will prescribe the custom aligners and oversee each individual treatment plan. The Registration Statement stated, in relevant part:

> Our member journey starts with two convenient options: a member books an appointment to take a free, in-person 3D oral image at any of our over 300 retail stores ("SmileShops") . . ., or orders an easy-to-use doctor prescribed impression kit online, which we mail directly to their door. Using the image or impression, we create a draft custom treatment plan that demonstrates how the member's teeth will move during treatment. Next, *via SmileCheck, a state licensed doctor within our network reviews and approves the member's clinical information and treatment plan*. If the member is a good candidate for clear aligners and decides to purchase, *the treating doctor prescribes custom-made clear aligners*, which we then manufacture and shop directly to the member. In addition, the member has the opportunity to review a 3D rendering of how their teeth will move during treatment as part of their purchase decision. *SmileCheck is also used by the treating doctor to monitor the member's progress and enables seamless communication with the member over the course of treatment*. Upon completion of treatment, a majority of our members purchase retainers every six months to prevent their teeth from relapsing to their original position. We also offer a growing suite of ancillary oral care products, such as whitening kits, to maintain a perfect smile.

(emphasis added).

> The treatment plan is [] sent to a state licensed doctor in our network. Within 48 hours, the doctor reviews the treatment plan, together with the member's oral photos, dental and health history, and chief complaint, and, where appropriate, approves the member's clinical information and treatment plan and prescribes custom-made clear aligners.

37.     With regard to the Company's marketing and advertising efforts, the Registration Statement stated, in relevant part:

> *We are subject to consumer protection laws that regulate our marketing practices and prohibit unfair or deceptive acts or practices. Our actual or perceived failure*

*to comply with such obligations could harm our business, and changes in such regulations or laws could require use to modify our products or marketing or advertising efforts.*

In connection with the marketing or advertisement of our products and services, we could be the target of claims relating to false, misleading, deceptive, or otherwise noncompliant advertising or marketing practices, including under the auspices of the FTC and state consumer protection statutes. If we rely on third parties to provide any marketing and advertising of our products and services, we could be liable for, or face reputational harm as a result of, their marketing practices if, for example, they fail to comply with applicable statutory and regulatory requirements.

If we are found to have breached any consumer protection, advertising, unfair competition, or other laws or regulations, we may be subject to enforcement actions that require us to change our marketing and business practices in a manner which may negatively impact us. This could also result in litigation, fines, penalties, and adverse publicity that could cause reputational harm and loss of member trust, which could have an adverse effect on our business.

38.     With regard to pending and expected litigation, as well as state and federal investigation, the Company stated in the Registration Statement, in relevant part:

In the ordinary course of conducting our business, we are involved, from time to time, in various contractual, product liability, intellectual property, and other claims and disputes incidental to our business. Litigation is subject to many uncertainties, the outcome of individual litigated matters is not predictable with assurance, and it is reasonably possible that some of these matters may be decided unfavorably to us. It is the opinion of management that the ultimate liability, if any, with respect to our current litigation outstanding will not have a material adverse effect on our business, results of operations, and financial condition.

We periodically receive communications from state and federal regulatory and similar agencies inquiring about the nature of our business activities, licensing of professionals providing services, and similar matters. Such matters are routinely concluded with no financial or operational impact on us. Currently there are no actions with any agency that are expected to have a material adverse effect on our business, results of operations, and financial condition.

39.     The Registration Statement was materially false and misleading and omitted to state: (1) that administrative personnel, rather than licensed doctors, provided treatment to the Company's customers and monitored their progress; (2) that, as a result, the Company's practices did not qualify as teledentistry under applicable standards; (3) that, as a result, the Company was

subject to regulatory scrutiny for the unlicensed practice of dentistry; (4) that the efficacy of the Company's treatment was overstated; (5) that the Company had concealed these deceptive marketing practices prior to the IPO; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

### The Subsequent Disclosure

40.    On September 24, 2019, a class action complaint was filed in the U.S. District Court for the Middle District of Tennessee by dentists, orthodontists, and consumers against SmileDirectClub and certain of its officers and directors for false advertising, fraud, negligence, and unfair and deceptive trade practices (the "*Ciccio* Complaint").  The *Ciccio* Complaint alleges, *inter alia*, that inaccurate statements were made in the Registration Statement and that the Company is subject to litigation for operating as a dentist without proper licensing in several states (specifically, a Federal District Court in Georgia found that SDC was illegally operating as a dentist in connection with its business operations).

41.    The *Ciccio* Complaint claims that the Company's assertion that "a treating doctor monitors a member's progress" is untrue.   Explicitly, the *Ciccio* Complaint alleges that "SmileDirect[Club] members do not even know the identity of the dentists who are involved in their case (to the extent that they are involved). Smile Direct refuses to disclose the names, addresses, and any identifying information with respect to such dentists, and therefore no patient-doctor relationship is ever actually established."  In addition, the *Ciccio* Complaint alleges that, despite the Company stating otherwise, "communications between SmileDirect[Club] and customers are handled by unlicensed administrative personnel" rather than licensed doctors.

42.     The *Ciccio* Complaint disputes the Company's purported business operations characterization as "teledentistry" by alleging that SDC does not meet the industry standard policy, as set by the American Dental Association ("ADA"), for teledentistry because dentists and orthodontists affiliated with SmileDirectClub "do not interact directly or even indirectly with customers."

43.     In its advertising and marketing materials, SmileDirectClub claims that its product can help "correct bite issues."  The *Ciccio* Complaint alleges that in actuality, the aligners are more likely to worsen bite issues than correct them, and the aligners manufactured and sold by SmileDirectClub can only address alignment and "will not correct any existing bite issue."

44.     As a result of these, and other, fraudulent and deceptive marketing practices, as alleged in the *Ciccio* Complaint, SmileDirectClub was subject to various lawsuits, as identified in the *Ciccio* Complaint:

    a.  At least 40 state claims filed by the relevant state affiliate of the American Associate of Orthodontists alleging, in a substantiated fashion, that SmileDirect[Club] is illegally operating as a dentist without proper licensing in the subject state. Indeed, a Federal District Court in Georgia recently found that SmileDirect[Club] was in fact illegally operating as a dentist in connection with its ordinary course practices. *See* Exhibit A, attached hereto.

    b.  A length, detailed and substantiated Citizen petition filed by the American Dental Association with the federal Food and Drug Administration alleging in a detailed and substantiated fashion that SmileDirect[Club] is in continuing violation of the FD&C Act because it is selling plastic aligners that it manufactures in Tennessee (a) without a valid prescription and (b) without having had such aligners approved pursuant to a 510(k) clearance procedure. *See* Exhibit B, attached hereto.

    c.  A complaint filed by the American Dental Association with the Federal Trade Commission ("FTC") requesting that the FTC investigate numerous false and misleading claims made by SmileDirect[Club] to fraudulently entice customers to purchase its products and services. The ADA's detailed lengthy complaint alleges that SmileDirect[Club] has made false and misleading claims and engages in unfair and deceptive practices within the

11

meaning of Section 5 of the Federal Trade Commission Act ("FTCA"), 15
U.S.C. § 45. *See* Exhibit C, attached hereto.

d.  Thousands of substantiated, serious customer complaints with respect to the
efficacy of the SmileDirect[Club] aligner treatment and injuries suffered
with respect thereto. Among these thousands of complaints are complaints
that the product did not work, that the product came in a broken fashion,
and that the product made consumers' teeth "worse" and, in certain
instances, substantially worse.

- "Product made my teeth worse with spacing and gaps. Did not work as
described and was led to believe it would get fixed … After five months
and four aligners and a cracked tooth and numerous attempts to talk to
customers service to fix my issues all of which led nowhere."

- "Please don't do this to yourself - especially if you're just trying to save
money … A few months closer to the seventh month, my crown and
implant - which was super expensive to get done - came off together.
When I called them about this, they kept making me email people … I
am here months later with about the same smile as before, $1700 down
the drain, and my crown and implant not intact."

(ellipses in original).

45.     Moreover, the *Ciccio* Complaint alleges that the Company and its officers
and directors engaged in efforts to cover up such criticism prior to the IPO.  As stated in
the *Ciccio* Complaint, "dentists, orthodontists, and other parties have received a barrage of
'cease and desist' letters from SmileDirect[Club's] counsel threatening lawsuits and
threatening the filing of ethical complaints with regulators against such professionals who
have merely voiced legitimate substantiated opinions regarding the clear inadequacy of the
SmileDirect Program."

46.     On this news, the SDC share price fell $1.47 (or nearly 9%), from $17.15 to $15.68
per share on September 24, 2019, on unusually high trading volume.  The price continued to
decline over the next two trading sessions to close at $14.51 on September 25, 2019, and $12.94
on September 26, 2019, on unusually high trading volume.  The cumulative decline as a result of
this disclosure was $4.21.

47.     By the commencement of this action, SDC's stock was trading as low as $9.44 per share, a decline of nearly 60% from the $23.00 per share Offering Price.

## LOSS CAUSATION

48.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of SDC's shares and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of SDC's shares fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of SDC's shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired SmileDirectClub Class A common stock (a) pursuant and/or traceable to Registration Statement issued in connection with the Company's IPO, or that purchased or (b) suffered damages in connection with the wrongdoing described in detail below during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SDC's shares actively traded on the Nasdaq.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained

through appropriate discovery, plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of SDC shares were traded publicly during the Class Period on the Nasdaq.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SmileDirectClub; and

(c)     to what extent the members of the Class have sustained damages and the proper measures of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

14

damages suffered by individual Class members may be relatively small, the expense and burden of the individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE

55.     At all relevant times, the market for SmileDirectClub's Class A common stock was an efficient market for the following reasons, among others:

(a)     SDC's shares met the requirements for listing, and were listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)     As a regulated issuer, SDC filed public reports with the SEC and Nasdaq;

(c)     SDC regularly and publicly communicated with investors via established market communication mechanisms; and

(d)     SDC was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

56.     As a result of the foregoing, the market for SDC's shares promptly digested current information regarding SmileDirectClub from all publicly available sources and reflected such information in the price of SDC's shares.  Under these circumstances, all purchasers of SDC shares during the Class Period suffered similar injury through their purchase of SDC shares at artificially inflated prices and the presumption of reliance applies.

57.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliate Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because

the Class' claims are grounded on Defendants' material omissions.  Because this action involves

Defendants' failure to disclose material adverse information regarding its marketing and

operational practices – information that Defendants were obligated to disclose – positive proof of

reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be

material in the sense that a reasonable investor might have considered them important in making

investment decisions.  Given the importance of marketing and advertising, the efficacy of the

aligners, and customer's purported communications with licensed doctors to SmileDirectClub's

operational and financial success, *i.e.*, the impact that could have on the Company's future

revenue generation, that requirement is satisfied here.

**COUNT I**
**Violation of Section 11 of the Securities Act**
**(Against All Defendants)**

58.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

59.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k,

on behalf of the Class, against the Defendants.

60.     The Registration Statement for the IPO was inaccurate and misleading, contained

untrue statements of material facts, omitted to state other facts necessary to make the statements

made not misleading, and omitted to state material facts required to be stated therein.

61.     SmileDirectClub is the registrant for the IPO.  The Defendants named herein were

responsible for the contents and dissemination of the Registration Statement.

62.     As issuer of the shares, SmileDirectClub is strictly liable to Plaintiff and the Class

for the misstatements and omissions.

63.     Plaintiff purchased shares traceable to the IPO.

16

64.     Plaintiff and the Class have suffered damages.  The value of SDC stock has declined substantially after and as a result of Defendants' violations.

65.     Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

66.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement was true and without omissions of any material facts and were not misleading.

67.     By reason of the foregoing, Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiff and the other members of the Class pursuant to Section 11(e).

## COUNT II
### Violation of Section 15 of the Securities Act
### (Against the Camelot and the Individual Defendants)

68.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

69.     This count is asserted against the Individual Defendants and Camelot and is based upon Section 15 of the Securities Act.

70.     The Individual Defendants and Camelot, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons/entities of SmileDirectClub within the meaning of Section 15 of the Securities Act.  The Individual Defendants and Camelot had the power and influence and exercised the same to cause

SmileDirectClub to engage in the acts described herein, including by causing SmileDirectClub to conduct the Offering pursuant to the Registration Statement.

71.     The Individual Defendants' and Camelot's positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

72.     By virtue of the conduct alleged herein, the Individual Defendants and Camelot are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**COUNT III**
**Violation of Section 10(b) of the Exchange Act**
**(Against SmileDirectClub, Camelot, and the Individual Defendants)**

73.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.     During the Class Period, SmileDirectClub, Camelot, and the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase SDC shares at artificially inflated prices.

75.     SmileDirectClub, Camelot, and the Individual Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue or misleading statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for SDC's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     During the Class Period, SmileDirectClub, Camelot, and the Individual Defendants made the false or misleading statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.   The Individual Defendants engaged in this misconduct to conceal the Company's true condition from the investing public and to support the artificially inflated prices of the Company's shares.

78.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SDC's shares.  Plaintiff and the Class would not have purchased the Company's shares at the prices they paid, or at all, had they been aware that the market prices for SDC shares had been artificially inflated by these Defendants' fraudulent course of conduct.

79.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's shares during the Class Period.

80.     By virtue of the foregoing, SmileDirectClub, Camelot, and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IV
## Violation of Section 20A of the Exchange Act
## (Against Camelot and the Individual Defendants)

81.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

82.     The insider trading claims alleged herein arise from the issuance of approximately 56% of SDC's equity interest through the IPO by Camelot and the Individual Defendants on or around September 12, 2019, while in possession of material, nonpublic information.   The Individual Defendants and Camelot still retained approximately 96% of the voting rights of the Company after selling approximately 56% of the equity interest to public investors without disclosing material information.

83.     As a result of the Individual Defendants' and Camelot's failure to disclose material information to the public, the IPO was conducted at an inflated price to the market.  The Individual Defendants and Camelot received approximately $1,132.3 million in proceeds from the issuance of 58,537,000 common shares, while in possession of material, nonpublic information.  By reason of such conduct, the Individual Defendants and Camelot are liable pursuant to Section 20A of the Exchange Act.

## COUNT V
## Violation of Section 20(a) of the Exchange Act
## (Against Camelot and the Individual Defendants)

84.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

85.     Camelot and the Individual Defendants acted as controlling persons of SmileDirectClub within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct

20

involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about SmileDirectClub, Camelot and the Individual Defendants had the power and ability to control the actions of SmileDirectClub and its employees. By reason of such conduct, Camelot and the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 if the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 20, 2019

By:     _____

Ira M. Press
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
Facsimile: (212) 699-1194
Email: ipress@kmllp.com